Krysta Kauble Pachman, CA Bar No. 280951
Eliza Finley, CA Bar No. 301318
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
kpachman@susmangodfrey.com
efinley@susmangodfrey.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMENICA BERMAN and ABYGAEL PIEHL, individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs,*<br><br>vs.<br><br>FORBES MEDIA LLC,<br><br>    *Defendant.* | Case No. ___3:24-cv-9287___<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violations of the Invasion of Privacy Act, Cal. Penal Code § 638.51;<br>2. Violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiffs Domenica Berman and Abygael Piehl, individually and on behalf of all others similarly situated, file this Class Action Complaint against defendant Forbes Media LLC ("Forbes" or "Defendant"), and in support state the following. All allegations, except those relating to Plaintiffs, are based on information and belief.

**INTRODUCTION**

1.     This lawsuit concerns Forbes's surreptitious collection and sharing of data from visitors to its website, Forbes.com.

2.     Without first obtaining consent, Forbes uses various trackers on Forbes.com to collect and share information about its visitors—including their IP addresses and other unique identifiers—with third parties. These trackers include, but are not limited to, the LinkedIn Insight Tag, the Bing Universal Event Tracking ("UET") Tag, and the Adnx Tracker, developed by LinkedIn, Microsoft, and Xandr, respectively (collectively, "the Trackers"). The collected information is used by Forbes and third parties to optimize targeted advertising campaigns.

3.     The Trackers are "pen registers" under § 638.50(b) of the California Invasion of Privacy Act ("CIPA") because they record "routing, addressing, or signaling information" transmitted by the devices of Forbes.com visitors. Cal. Penal Code § 638.50(b). The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

4.     Forbes repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order.

5.     Forbes's installation and use of the Trackers also violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

**THE PARTIES**

6.    Plaintiffs' IP addresses and other data and identifiers associated with their devices and browsers were collected, recorded, and shared by the Trackers when they visited Forbes.com. They bring California state law claims on behalf of similarly situated Forbes.com visitors (the "Class" as defined in Paragraph 64) arising from Forbes's unauthorized use of the Trackers.

7.    Ms. Berman is an adult living in Encinitas, California. She visited Forbes.com within the last year while in California.

8.    Ms. Piehl is an adult living in San Diego, California. She visited Forbes.com within the last year while in California.

9.    Defendant Forbes is a Delaware limited liability corporation, with a principal place of business in New Jersey. Forbes owns and operates Forbes.com, which covers news and information on business, investing, technology, entrepreneurship, leadership, and affluent lifestyles.

**JURISDICTION AND VENUE**

10.    Based on estimates derived from website traffic data, at least 2.2 million unique visitors (excluding registered users) visited Forbes.com from California during the last year. CIPA provides for $5,000 in statutory damages per violation, resulting in potential damages exceeding $11 billion. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA") because this is a class action in which the amount in controversy exceeds $5 million exclusive of interest and costs, there are over 100 members of the putative Class, and at least one Class member is a citizen of a different state than Defendant. 28 U.S.C. § 1332(d).

11.    This Court has personal jurisdiction over Forbes due to Forbes's purposeful conduct originating from California and directed at California residents. Forbes has a physical office in San Francisco that is home to its second-largest editorial hub and its marketing and advertising operations. Forbes expanded its

2
COMPLAINT

physical presence in California to "better capitalize on integrated marketing and sales opportunities and to expand its coverage of Silicon Valley and the larger tech community."[1] Forbes thus purposefully directed and marketed the content of its website to California residents by, among other things, covering news about California and expanding its marketing and sales operations in California. Forbes also knew that it was tracking and sharing data about California residents visiting its website and should have reasonably foreseen that their actions would cause harm within California. Forbes also uses servers in San Francisco to host content for Forbes.com, and, as explained below, those servers are responsible for sending instructions to Forbes.com visitors' browsers to share IP addresses and other unique identifiers with third parties.

12.    Venue is proper under 28 U.S.C. § 1391 because Defendant does substantial business within this District and a substantial portion of Class members were injured in this District.

13.    Divisional Assignment: A substantial part of the events and conduct which give rise to the claims herein occurred in San Francisco County.

## FACTUAL ALLEGATIONS ABOUT FORBES

### I.    The California Invasion of Privacy Act

14.    The California Invasion of Privacy Act is codified at California Penal Code §§ 630 to 638. The Act begins with an expansive statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.
>
> The Legislature by this chapter intends to protect the right of privacy of

---

[1] *Forbes Media Expands San Francisco Presence with Move to New Office*, FORBES, July 13, 2017, https://www.forbes.com/sites/forbespr/2017/07/13/forbes-media-expands-san-francisco-presence-with-move-to-new-office/ (last accessed Dec. 16, 2024).

the people of this state.

Cal. Penal Code § 631.

15.    Consistent with this purpose, under CIPA a person "may not install or use a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

16.    California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

17.    California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

18.    An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Penal Code § 629.51(a)(2).

19.    A person injured by a CIPA violation may bring an action for $5,000 per violation. Cal. Penal Code § 637.2.

## II.    Forbes's Trackers Are "Pen Registers" and "Trap and Trace Devices" under CIPA.

20.    The process of visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits Forbes.com, their browser initiates a series of web requests to Forbes's servers to retrieve the webpage and its associated resources. The servers respond by sending back the webpage's HTML content along with other resources likes scripts,

stylesheets, and images needed to display the page. As the browser processes these resources, additional requests may be triggered by scripts running on the page.

21.    The Trackers are scripts of code that Forbes has integrated into its website. The code causes a visitor's browser to send the visitor's IP address, browser and device data, and other unique identifiers, such as cookies, with the developers of the Trackers while the visitor's browser is communicating with Forbes.com's servers.

22.    An IP address is a unique numerical identifier, similar to a phone number, that helps devices connect to websites and services over the internet. When someone connects to the internet through their home internet service (like Comcast or AT&T) or a business internet service, that connection is assigned an IP address. This IP address is like a return address that shows a server where to send data. IP addresses can provide information about a website visitor's approximate geographic location, often down to a ZIP code level.

23.    A cookie is a small text file stored on a device by a website to save information about a user's visit. Cookies can be used, for example, to authenticate users, for session management, to personalize user experiences, or for tracking. Cookies can monitor a person's behavior across visits to the same website or other websites for analytics or targeted advertising.

24.    When combined with other data collected and shared by the Trackers, IP addresses contribute significantly to creating a detailed profile of a person's online activity. For example, IP addresses can be associated with information about the websites a person visits, the links they click, the time spent on each page, and even information submitted on online forms. Patterns of IP address usage, such as accessing the same webpage regularly on the same device from two distinct locations (*e.g.*, home and work), can even uniquely identify a specific individual, as few others would exhibit the same combination of access points. Over time, the collected data may reveal a person's interests, behaviors, routines, and personal characteristics such

as age, gender, occupation, marriage status, and income. This data is used to help companies target their own marketing efforts and to increase clicks and impressions generated through targeted advertisements hosted on their websites.

25.    Forbes does not ask for or receive the consent of visitors before using the Trackers. In fact, Forbes.com begins the process of tracking and sharing a visitor's data as soon as the visitor opens a Forbes.com webpage. It is therefore impossible for visitors to knowingly provide consent before their browsers are instructed to share their IP addresses, unique identifiers such as cookies, and other information with third parties.

26.    Forbes's use of the Trackers invades the privacy of visitors by sharing their IP addresses and other identifiers and information about their visit to Forbes.com with third parties for marketing and advertising purposes without their consent. The Trackers exacerbate this invasion of privacy by correlating data about a person's visit to Forbes.com with other data that the Trackers have collected, such as their LinkedIn profile and their visits to other websites which have embedded the same Trackers.

27.    As alleged in more detail below, the Trackers are "pen registers" under CIPA because they capture and transmit Forbes.com visitors' IP addresses and other unique identifiers—*i.e.*, "routing, addressing, or signaling information"—when visitors' browsers and Forbes's servers exchange HTTP messages. Cal. Penal Code § 638.50(b). The Trackers also qualify as "trap and trace" devices because they capture and transmit "the identifying originating number or other dialing, routing, addressing, and signaling information" that is "reasonably likely to identify the source of a wire or electronic communication." Cal. Penal Code § 638.50(c). The Trackers do not collect the content of the communications between visitors' browsers and Forbes.com.

28.    Each tracker is a "device or process" within the meaning of Cal. Penal Code § 538.50(b) because it is part of a software and because it must be run on a computing device to function.

29.    The devices that visitors use to visit Forbes.com—*i.e.*, computers, smartphones, and tablets—are "instruments" or "facilities" within the meaning of Cal. Penal Code § 638.50(b).

30.    On information and belief, Forbes did not obtain a court order before installing or using the Trackers on its website.

A.    **The LinkedIn Insight Tag**

31.    LinkedIn is a social media platform for the business community. Individuals can open a LinkedIn account by providing their full name and email address, along with additional personal information.

32.    The LinkedIn Insight Tag is a piece of JavaScript code developed by LinkedIn that Forbes integrated into its website. After the LinkedIn Insight Tag is installed, the tag saves cookies on visitors' web browsers that allow LinkedIn to match Forbes.com website visitors to their respective LinkedIn member accounts. LinkedIn's website explains: "The LinkedIn Insight Tag enables the collection of data regarding members' visits to your website, including the URL, referrer, IP address, device and browser characteristics (User Agent) and timestamp."[2] This data allows LinkedIn to gather insights into its members' interests, behaviors, and connections as they browse across the internet, for analytics and advertising purposes.

33.    Forbes installed the LinkedIn Insight Tag on its website to track and improve the effectiveness of its advertisements. By tracking a visitor's IP address and cross-referencing it with other information that LinkedIn has about the visitor, the LinkedIn Insight Tag allows Forbes to "track conversions, retarget website

---

[2] *LinkedIn Insight Tag FAQs*, LINKEDIN, https://www.linkedin.com/help/lms/answer/a427660 (last visited Dec. 16, 2024).

visitors, and learn aggregate insights about categories of members interacting with [Forbes's] ads,"[3] as well as gather information about visitors' "job titles, companies, industries, and more."[4]

34.    When a visitor initially visits Forbes.com, the visitor's browser sends a web request to Forbes's servers, and Forbes's servers respond with instructions to store various cookies on the visitor's browser. This is captured in the following image, which shows the cookies installed by the LinkedIn Insight Tag after a visitor opens Forbes.com:



35.    According to LinkedIn, the cookies installed by the LinkedIn Insight Tag perform the following functions:

- li_sugr: "Used to make a probalistic match of a user's identity"

---

[3] *Id.*
[4] *Insight Tag*, LINKEDIN, https://business.linkedin.com/marketing-solutions/insight-tag (last visited Dec. 16, 2024).

- bcookie: "Browser Identifier cookie to uniquely identify devices accessing LinkedIn to detect abuse on the platform and diagnostic purposes"
- UserMatchHistory: "LinkedIn Ads ID syncing"
- _guid: "Used to identify a LinkedIn Member for advertising through Google Ads"
- lms_ads: "Used to identify LinkedIn Members off LinkedIn for advertising"
- lms_analytics: "Used to identify LinkedIn Members off LinkedIn for analytics"[5]

36.     LinkedIn explicitly encourages website owners to enable "enhanced conversion tracking" in the Insight Tag settings "to continue capturing signals where 3rd party cookies are blocked."[6] This means that LinkedIn could continue to receive data about Forbes.com visitors even if those visitors instructed their browsers to block third party cookies.

**B.     The Universal Event Tracking (UET) Tag**

37.     The UET Tag is another piece of tracking code that Forbes added to its website to send data about Forbes.com visitors to Microsoft so that Forbes can "track conversion goals and target audiences with remarketing lists."[7] In other words, the UET Tag sends data to Microsoft when visitors take certain actions (such as reading an article or clicking an advertisement) so that Microsoft can target ads to those same visitors when they visit other websites.

---

[5] *LinkedIn Cookie Table*, LINKEDIN, https://www.linkedin.com/legal/l/cookie-table (last accessed Dec. 16, 2024).
[6] *Insight Tag*, LINKEDIN, https://business.linkedin.com/marketing-solutions/insight-tag (last visited Dec. 16, 2024).
[7] *Universal Event Tracking*, MICROSOFT, https://about.ads.microsoft.com/en/tools/performance/conversion-tracking (last accessed Dec. 16, 2024).

38.    Microsoft states that the UET Tag collects "the IP address and the Microsoft cookie" from visitors.[8]

39.    When a visitor initially visits Forbes.com, the visitor's browser sends an HTTP request to Forbes's servers, and Forbes's servers respond with instructions to store various cookies on the visitor's browser, including the MUID cookie, and to send Microsoft the visitor's IP address.

40.    According to Microsoft, the MUID cookie is "a Microsoft cookie that contains a GUID [globally unique identifier] assigned to your browser. It gets set when you interact with a Microsoft property, including a UET beacon call or a visit to a Microsoft property through the browser."[9] In other words, the UET Tag assigns a unique and persistent identifier to a specific browser to track a person's activity across the internet over time, including their visits to Forbes.com.

41.    The image below shows the MUID cookie installed by the UET Tag after a visitor opens a Forbes.com:



## C.    **The Adnx Tracker**

42.    The Adnx Tracker was developed by software company Xandr, which was bought by Microsoft in 2021.

---

[8] *FAQ: Universal Event Tracking*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2 (last accessed Dec. 16, 2024).
[9] *Id.*

43.     Xandr is an advanced advertising company that helps companies buy and sell advertising space on websites. Xandr's platform seeks to improve the efficiency and effectiveness of advertising across various channels. Their services include programmatic advertising, data analytics, and cross-screen media solutions. Microsoft explains on its website that "[w]ith Xandr, Microsoft can accelerate the delivery of digital advertising solutions for the open web by combining Microsoft's audience understanding, technology and global advertising customer base with Xandr's large-scale, data-driven platforms for advertising."[10]

44.     Essentially, the Adnx Tracker helps Forbes display targeted advertisements by using information gathered by Xandr about a specific visitor, including data about their visits to other websites that use the Adnx Tracker. This is enabled by the transmittal of the visitor's IP address and other unique identifiers to Xandr.

45.     The Adnx Tracker works through a tracking code added to the Forbes.com website that causes a visitor's browser to send the visitor's IP address to Xandr, which stores it in a cookie on the visitor's device for future visits. The image below shows a visitor's browser sending its IP address (*i.e.*, X-Proxy-Origin) in response to instructions sent by the Adnx Tracker:

---

[10] Mikhail Parakhin, *Microsoft to acquire Xandr to accelerate delivery of digital advertising and retail media solutions*, MICROSOFT ADVERTISING, Dec. 21, 2021, https://about.ads.microsoft.com/en/blog/post/december-2021/microsoft-to-acquire-xandr-to-accelerate-its-digital-advertising-and-retail-media-solutions (last accessed Dec. 16, 2024).

46.    The above image also shows the installation of the "XANDR_PANID" cookie, which originates from Xandr, and the "uuid2" cookie which remains the same even if a visitor's IP address changes between sessions. This allows Xandr to persistently identify the same visitor across sessions even if they change networks or locations.

**III.    Plaintiffs' Data Shared by Forbes Has Value.**

47.    The information surreptitiously shared by Forbes with third parties has economic value.

48.    In *The Wall Street Journal*, a former fellow at the Open Society Institute, Christopher Soghoian, explained:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.
>
> Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this

exchange were never clearly communicated to consumers.[11]

49. The value of the information shared by Forbes with third parties about its visitors can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure. Web browsing histories were valued at a rate of $52.00 per year, and online advertising click history was calculated at $5.70 a year.[12]

50. A number of platforms also allow consumers to directly monetize their own data.

- Ipsos works with Google to offer financial rewards to users in exchange for tracking their internet browsing activities.[13]

- Brave's web browser pays users to watch online targeted ads using "Basic Attention Tokens," which can be used to purchase gift cards.[14]

- Reklaim is a smartphone app through which consumers can elect to share their data with certain brands in exchange for compensation.[15]

- Nielsen also offers an application through which it tracks user activities in exchange for opportunities to win sweepstakes and earn rewards.[16]

51. Through its surreptitious sharing of visitor's data with third parties for the purpose of improving the efficacy of its advertising campaigns and providing

---

[11] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL, Nov. 15, 2011.
[12] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND, Jan. 18, 2011, https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html.
[13] *About the Ipsos Screenwise Panel*, IPSOS, https://screenwisepanel.com (last accessed Dec. 16, 2024).
[14] *Brave Rewards*, BRAVE, https://brave.com/brave-rewards/ (last accessed Dec. 16, 2024).
[15] What is a data order?, REKLAIM, https://help.reklaimyours.com/en/articles/7971152-what-is-a-data-order (last accessed Dec. 16, 2024).
[16] Computer & Mobile Panel, NIELSEN, https://computermobilepanel.nielsen.com (last accessed Dec. 16, 2024).

13
COMPLAINT

targeted advertisements on its websites, Forbes is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how to monetize their own data. Plaintiffs provided valuable data to Forbes and received nothing in return.

### FACTUAL ALLEGATIONS ABOUT THE NAMED PLAINTIFFS

52. Ms. Berman is an adult who lives in California.

53. She visited Forbes.com multiple times in early 2024, and again as recently as December 9, 2024, using a Chrome browser and a Microsoft Edge browser on both her computer and her mobile device.

54. She has never registered for a Forbes.com account or signed up for a Forbes.com newsletter.

55. When she visited Forbes.com, the Trackers collected her IP address and other unique identifiers consistent with the process described in paragraphs 20–46 and shared that information with third parties.

56. Ms. Berman never provided her consent to Forbes to install or use the Trackers on her browser.

57. Ms. Berman is aware that she can sell her own personal data via other platforms and applications. Forbes, however, never asked for her permission to share her data with third parties. Forbes's practices damaged Ms. Berman's privacy and her ability to control her own data.

58. Ms. Piehl is an adult who lives in California.

59. She visited Forbes.com multiple times in 2024, including as recently as December 18, 2024, using a Chrome browser on her computer.

60. She has never registered for a Forbes.com account or signed up for a Forbes.com newsletter.

61. When she visited Forbes.com, the Trackers collected her IP address and other unique identifiers consistent with the process described in paragraphs 20–46 and shared that information with third parties.

62.    Ms. Piehl has never provided her consent to Forbes to install or use the Trackers on her browser.

63.    Ms. Piehl is aware that she can sell her own personal data via other platforms and applications. Forbes, however, never asked for her permission to share her data with third parties. Forbes's practices damaged Ms. Piehl's privacy and her ability to control her own data.

**CLASS ACTION ALLEGATIONS**

64.    This is a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all California residents who accessed Forbes.com while in California using Chrome or Microsoft Edge browsers from December 20, 2023 through the present (the "Class Period"), have not registered accounts with Forbes or signed up for any Forbes newsletters, and had their IP address and other unique identifiers shared with third parties as a result of Trackers embedded in Forbes.com ("the Class").

65.    Excluded from the Class are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

66.    **Numerosity**: The Class likely consists of millions of members. There were at least 2.2 million unique visitors from California to Forbes.com in the last year, excluding registered users. Individual joinder of class members is thus impractical.

67.  **Predominant Common Questions**: Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual Class members. Common questions for the Class include, but are not limited to, the following:

a.  Whether Forbes in fact installed the Trackers on its website;

b.  Whether the Trackers cause a visitor's IP address and other identifiers to be sent to third parties;

c.  Whether the Trackers are "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50;

d.  Whether Forbes sought or obtained prior consent from Plaintiffs and the Class to disclose their IP addresses and other identifiers to third parties;

e.  Whether Forbes obtained a court order for its use of the Trackers;

f.  Whether Plaintiffs and Class members are entitled to statutory damages for Forbes's CIPA violations;

g.  Whether Forbes's use of the Trackers violated the UCL;

h.  Whether Plaintiffs and Class members have sustained damages because of Forbes's conduct and if so, what is the appropriate measure of damages or restitution; and

i.  Whether Plaintiffs and Class members are entitled to injunctive relief to enjoin the unlawful conduct alleged herein.

68.  **Typicality**: Plaintiffs' claims are typical of the claims of other Class members because Plaintiffs' IP addresses and other identifiers, like the IP addresses and other identifiers of Class members, were shared with third parties as a result of Trackers installed on Forbes.com.

69.  **Adequacy of Representation**: Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are competent and experienced in class action litigation, including nationwide class

actions and privacy violations. Plaintiffs and their counsel have no interest in conflict with, or otherwise antagonistic to, the interests of other Class members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.

70.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

## CAUSES OF ACTION

### COUNT 1
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 638.51(a)

71.    Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

72.    Plaintiffs bring this claim individually and on behalf of the Class against Forbes.

73.    Section 638.51 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order."

74.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

75.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other

dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

76.    The Trackers Forbes installed on its website are "pen registers" as defined by California Penal Code § 638.50(b) because they capture "dialing, routing, addressing or signaling information" from electronic communications transmitted by Plaintiffs' and Class members' devices. They are also "trap and trace devices" as defined by California Penal Code § 638.50(c) because they capture "dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication."

77.    During the Class Period, Defendant installed the Trackers on Forbes.com and used them to capture and transmit Plaintiffs' and Class members' IP addresses and other unique identifiers to third parties.

78.    Plaintiffs and Class members did not provide their consent prior to Forbes's installation and use of the Trackers. On information and belief, Forbes also did not obtain a court order to install or use the Trackers.

79.    Under California Penal Code § 637.2, Plaintiffs and Class members have been injured by Forbes's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

**COUNT 2**
**California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

80.    Plaintiffs hereby incorporate the foregoing allegations as if fully stated herein.

81.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Forbes installation and use of the Trackers on Forbes.com violates the UCL.

82.    Forbes's "unlawful" acts and practices include its violations of CIPA.

83.     Forbes's "unfair" acts and practices include its violation of privacy interests protected by CIPA.

84.     Plaintiffs and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Forbes's unfair and unlawful practices, including the unauthorized disclosure of their IP addresses, other identifiers, and browsing history on Forbes.com, which have monetary value. Plaintiffs and Class members have suffered harm in the form of diminution of value of their private and personally identifiable data and content.

85.     Forbes's conduct caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information, internet communications, and browsing history.

86.     Forbes reaped unjust profits and revenues in violation of the UCL. This includes Forbes's profits and revenues from hosting targeted advertisements and improvements to its own targeted advertisements. Plaintiffs and Class members seek restitution of these unjust profits and revenues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Certify this action is a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Appoint Plaintiffs to represent the Class;

C.     Appoint undersigned counsel to represent the Class;

D.     Award statutory damages of $5,000 for each violation of CIPA section 638.51(a);

E.     For all Counts, award compensatory damages to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

F.     Award pre- and post-judgment interest on all amounts awarded;

G.    Award restitution, disgorgement, and all other appropriate forms of injunctive and equitable relief;

H.    Award Plaintiffs and Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

I.    Grant Plaintiffs and Class members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Dated: December 20, 2024

**SUSMAN GODFREY L.L.P.**

By: */s/ Krysta Kauble Pachman*

Krysta Kauble Pachman (280951)
Eliza Finley (301318)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
kpachman@susmangodfrey.com
efinley@susmangodfrey.com

Shawn Rabin (*pro hac vice* forthcoming)
**SUSMAN GODFREY L.L.P.**
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
srabin@susmangodfrey.com

*Attorneys for Plaintiffs*

COMPLAINT